# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:11-cv-00145-LJO-MJS |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| v. | (Doc. 34) |
| SAFEE AYUB SALAMA, | |
| Defendant. | |
| _____/ | |

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Defendant Safee Ayub Salama became a naturalized citizen of the United States of America in 1996. Fifteen years later, in 2011, the United States initiated this action by filing a complaint to revoke and set aside the order admitting Salama to United States citizenship and cancelling his Certificate of Naturalization pursuant to 8 U.S.C. § 1451(a) on the ground that naturalization was unlawfully procured by concealment of a material fact or willful misrepresentation and due to a lack of good moral character during the relevant statutory period. (Compl., ECF No. 1.)  On June 24, 2011, a First Amended Complaint seeking the same relief (1st Am. Compl., ECF No. 15) was filed pursuant to stipulation

-1-

(ECF No. 14). Defendant's answer to the amended complaint was filed August 4, 2011. (Answer, ECF No. 17.)

An initial scheduling conference took place on October 28, 2011, following which the Court issued its Scheduling Order providing for all discovery to end by September 4, 2012, and trial to commence November 6, 2012. (Scheduling Order, ECF No. 25.)

The parties then consented to, and the District Court Ordered, Magistrate Judge jurisdiction for the limited purpose of empowering the Magistrate Judge to hear and decide Plaintiff's anticipated motion for summary judgment. (ECF No. 30.) The parties further stipulated to a summary judgment briefing schedule and set the hearing thereon for January 20, 2011. (ECF No. 33.)

Plaintiff's said motion was argued before the undersigned on January 20, 2011. Plaintiff's counsel, Kirsten Daeubler, and Defendant's counsel, H. Ty Kharazi, both appeared in person. The Court requested and the parties provided supplemental, post-hearing briefing. (ECF Nos. 38, 42-43.) The matter was then deemed submitted.

## II.  **FACTS**

Plaintiff moved for judgment revoking Defendant's naturalization on multiple grounds and posited some fifty-two facts which it contended were material to the motion and undisputed. (ECF No 34-1.) Not all facts relate to all grounds asserted. Many are undisputed.

The following facts are undisputed except where otherwise indicated, and they set the background for the instant dispute and motion:

Defendant, an Israeli by birth, entered the U. S. as a visitor in 1985. (Plaintiff's Undisputed Material Fact ("UMF") No. 1 and Defendant's response thereto. ECF No.

35-1.) In 1986 he was issued a spousal visa and also sought permanent residence status. (UMF Nos. 2-4.) Conditional residency status was granted in November 1987. (UMF Nos. 4-5.) It was made permanent in January 1990. (UMF Nos. 6-7.)

In February 1995, defendant applied for citizenship pursuant to 8 U.S.C. § 1427 based upon his having been a lawful U.S. resident for the preceding five years. (UMF Nos. 7-9.) The February 1995 application asked if Defendant had "...ever knowingly committed a crime for which you have not been arrested?" The "No" box next to that question was checked. (UMF Nos. 10-11.) The application also asked whether Defendant had ever "...been arrested, cited, charged,...fined or imprisoned for breaking or violating any law...?'" The"Yes" box next to the question was checked and a handwritten entry noted a 1988 arrest and "no contest " plea for arson. (UMF Nos. 12-14.) The form was signed by Defendant certifying under penalty of perjury that its contents were true and correct. (UMF No. 15.) Defendant does not dispute the above facts, but he maintains that the form was filled out entirely by his attorney Steven Simonian and signed by Defendant without reading it, but he believed it had been truthfully completed. (UMF Nos. 11, 13-14.)

On an unspecified date in February 1995, Defendant engaged in activity in Fresno County, California which resulted in him being charged with (and, later, in November 1996, pleading guilty to) felony presentation of a false or fraudulent claim for the payment of a loss or injury. (UMF No. 40.)

In a February 12, 1996, sworn interview regarding Defendant's application, an

Immigration and Naturalization Service ("INS")[1] Officer asked Defendant whether he had ever been arrested by the police. Defendant advised that in addition to the 1988 arson no contest plea described above, he had been arrested and convicted in 1993 for selling merchandise without a license. (UMF Nos. 16-18.) He disclosed no other criminal history. UMF No. 19.) Defendant's immigration application form was amended to add the information as to the 1993 arrest and Defendant signed it certifying under penalty of perjury that its contents were true and correct. (UMF Nos. 16-21.) Defendant again maintains that he merely signed when and where told to do so by his attorney and without having read the contents. (UMF No. 21.)

On February 21, 1996, nine days after the above interview, Defendant appeared in Fresno County, California, Superior Court to respond to felony perjury charges, i.e., violation of California Penal Code Section 118; he was then and there arrested and remanded into custody by order of the court. (UMF Nos. 34-35.) On May 15, 1996, the Fresno County, California, District Attorney filed an amended complaint in Defendant's criminal case charging Defendant with three counts of perjury (alleging criminal acts in 1987, 1990 and 1992) and four felony counts of presenting a false or fraudulent claim for the payment of a loss or injury (three in 1993 and one in 1995) in violation of California Penal Code 550(a)(1). (UMF No. 36; Motion for Summary Judgment ("MSJ"), Ex. 11.)

As noted, Defendant's dispute with the above facts does not relate to whether the events occurred as described by Plaintiff, but rather to Defendant's knowledge of their meaning and effect and as to the significance of his having certified the truth of the content

---

[1] On March 1, 2003, INS ceased to exist in light of the creation of the Department of Homeland Security. As the underlying events occurred before March 1, 2003 the Court shall continue to refer to the involved agency as INS.

of his immigration application when, he claims, he was unaware of those contents. The same is not true with regard to the events described in the next paragraph.

On June 6, 1996, Defendant underwent a continued naturalization interview with INS officer John Sturdivant. Officer Sturdivant does not specifically recall the meeting, but declares under penalty of perjury that he is certain he followed his standard practice and asked Salama under oath if he had been arrested or appeared in court at any time subsequent to the February 12, 1996, INS interview, and Salama answered in the negative. (UMF Nos. 23-25.) In a supplemental declaration, Sturdivant states under penalty of perjury that neither Salama nor his attorney disclosed that Defendant was then under investigation for insurance fraud. (Reply, Ex. B, ECF 36-2.) Sturdivant maintains that had Defendant or his attorney given any indication of any such investigation or of Defendant's February 1996 arrest, he would not have approved Defendant's application for naturalization (as he did), but instead would have continued the matter. (UMF Nos. 26-27.) Defendant disputes this June 1996 scenario. He maintains that the only question he was asked by Sturdivant was whether his address was still current, that his attorney answered two (undisclosed) questions, and then Defendant was told where to sign the application which he did without reading it.[2] (UMF Nos. 24-26.)

At or following the June 6, 1996, interview, Defendant was presented with a "Notice of Naturalization Oath Ceremony" form ("oath ceremony form"). It asked whether at any

_____

[2] Defendant also disputes that Sturdivant would not have approved the naturalization had he known of Defendant's February 1996 arrest, but only on the basis that he is not aware of Sturdivant's practices. However, it is noted that Defendant's lack of knowledge of Sturdivant's practices does not make the fact disputed. "Evidence raising a genuine issue of material fact is that which is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial." Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 735 F.2d 346, 348 (9th Cir.1984). Defendant does not argue that Plaintiff's claim is factually incorrect, just that Plaintiff does not have sufficient personal knowledge to know if the statement is factually accurate.

-5-

time since his initial naturalization interview Defendant had "...knowingly committed any crime or offense for which you have not been arrested; or have you been arrested, cited, charged, indicted, convicted, fined , or imprisoned for breaking any law or ordinance...". (UMF No. 28-29.) Defendant responded to the question by checking the "No" box. (UMF No. 30.) The form was signed by Defendant on July 10, 1996, over a certification that the answers were true and correct. (UMF No. 31.) On August 5, 1996, Defendant presented the oath ceremony form at his naturalization ceremony and received a Certificate of Naturalization. (UMF No. 32.) Again, Defendant does not dispute these facts except insofar as to assert that his attorney, not Defendant, filled out the form and instructed him to sign it without reading it. (UMF Nos. 28, 30-31.)

On November 4, 1996, Defendant pled guilty in Fresno County Superior Court to, and was convicted of, one felony count of presenting a false or fraudulent claim for the payment of a loss or injury during February 1995, and he was sentenced to ninety days incarceration, ordered to pay $10,000 in restitution, and placed on probation for three and one half years. (UMF Nos. 40-42.)

In essence, Plaintiff states as additional undisputed material facts that if Defendant had at any time between his initial February 12, 1996, interview and his August 5, 1996, naturalization ceremony disclosed the February 1995 act of insurance fraud (for which he was later prosecuted and convicted) or his February 21, 1996 court appearance and arrest, he would not have been naturalized. (UMF No. 43.) Defendant 'disputes' these facts but only on the basis of lack of knowledge as to INS's and its agents' practices. (Id.)

## III.    PLAINTIFF'S CLAIMS

In its motion for summary judgment, Plaintiff asserts multiple grounds for revoking

Defendant's naturalization and cancelling his Certificate of Naturalization pursuant to 8 U.S.C. § 1451(a):

1.)     Defendant illegally procured his naturalization because he was not in fact of the requisite good moral character because he committed felony insurance fraud, a crime involving moral turpitude, during the relevant statutory period;

2.)     Defendant illegally procured his naturalization because he was not in fact of the requisite good moral character because by testifying on June 6, 1996, that he had not been arrested or appeared in Court (other than as previously disclosed), he provided false testimony to obtain naturalization.

3.)     Defendant procured his citizenship through fraud or concealment in that he did not disclose his February 1995 insurance fraud crime; and,

4.)     Defendant procured his citizenship through fraud or concealment in that he did not disclose that on February 21, 1996, he had appeared in court and been arrested and had felony charges pending against him.

**IV.     DEFENDANT'S RESPONSE TO PLAINTIFF'S CLAIMS**

Reduced to barest essentials,  Defendant's responses to Plaintiff's claims can be roughly summarized as follows:

1.)     Defendant at no time withheld, but instead at all times disclosed to his attorney, all relevant facts and he believed that his attorney had honestly disclosed those facts to INS; he therefore could not be said to have had the willful, subjective intent to deceive, a prerequisite to showing bad moral character by not disclosing relevant facts;

2.)     Defendant denies that on June 6, 1996, Sturdivant asked him or his attorney any questions about whether he had been in court or had been arrested creating a bona

-7-

fide dispute of fact precluding summary judgment on the claim he testified falsely at that time (particularly since Sturdivant does not specifically recall the meeting).

3.)     Defendant disputes that he was ever arrested for perjury or insurance fraud (but does not dispute that he appeared in court and was arrested on February 21, 1996);

4.)     Defendant did not know at any time prior to naturalization that the event which precipitated his November 4, 1996, guilty plea constituted the crime of insurance fraud; and,

5.)     Extenuating circumstances can be shown to refute a denial of naturalization arising out of an unlawful act which indicates bad moral character.

**V.     DISCUSSION**

**A.     Summary Judgment**

Summary judgment is appropriate only if there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Although "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. at 247-48, summary judgment is not warranted if a "reasonable jury could return a verdict for the nonmoving party," id. at 248.

In a denaturalization proceeding, the government bears the "heavy burden" of providing "clear, unequivocal, and convincing" evidence that citizenship should be revoked. United States v. Arango, 670 F.3d 988, 992-993 (9th Cir. 2012); United States v. Dang, 488 F.3d 1135, 1139 (9th Cir. 2007) (quoting Fedorenko v. United States, 449 U.S. 490, 505 (1981)). The government's evidence justifying denaturalization must "not leave the issue in doubt." Arango, 670 F.3d at 992-993. As the Supreme Court has recognized, "the

clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions. . . ." Anderson, 477 U.S. at 255. Thus, summary judgment for the government in a denaturalization proceeding is warranted in narrow circumstances: if, viewing the evidence in the light most favorable to the naturalized citizen, there is no genuine issue of material fact as to whether clear, unequivocal, and convincing evidence supports denaturalization.

The government bears the burden of such a high degree of proof in denaturalization proceedings because of the "importance of the right that is at stake." Fedorenko, 449 U.S. at 505-06; see also id. at 505 ("[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences."); Schneiderman v. United States, 320 U.S. 118, 122 (1943) ("[Citizenship] once conferred should not be taken away without the clearest sort of justification and proof."). Thus, although summary judgment may be appropriate in certain circumstances, see, e.g., Dang, 488 F.3d at 1137-38 (affirming district court's grant of summary judgment when the evidence established that the citizen had committed criminal acts precluding a finding of good moral character during the relevant statutory time period, thus warranting denaturalization), it should not be granted lightly.

**B.** **Ground One - Lack of Good Moral Character**

1. Legal Standard

To be eligible for naturalization, an applicant must establish certain residency requirements, physical presence in the United States for a requisite period, and a showing of good moral character. See 8 U.S.C. § 1427. The only contested issue here is Salama's ability to demonstrate his good moral character for the relevant statutory period, which runs from the five years immediately preceding the filing of his naturalization application until the

oath of allegiance was administered. See 8 C.F.R. § 316.10(a)(1); Dang, 488 F.3d at 1139. The Court must "evaluate claims of good moral character on a case-by-case basis," considering certain statutory restrictions and "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). The Court must make a determination regarding the applicant's moral character during the statutory period, but it "may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to [the statutory period]." 8 C.F.R. § 316.10(a)(2).

While Congress has not "specifically define[d] what 'good moral character' is," United States v. Jean-Baptiste, 395 F.3d 1190, 1193 (11th Cir. 2005), it has established certain standards for determining when an applicant for naturalization cannot be found to have the requisite "good moral character." See 8 U.S.C. § 1101(f). For example, Congress determined that any person who is a habitual drunkard, whose income is derived principally from illegal gambling activities, or who has been convicted of an aggravated felony shall be found to lack good moral character, and is accordingly ineligible for naturalization. Id. Additionally, 8 U.S.C. § 1101(f)(9) contains a "catch-all" provision, which provides, "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

Pursuant to the authority granted by Congress in this catch-all provision, the Attorney General issued regulations which provide additional criteria for when a naturalization applicant shall be found to lack good moral character. See 8 C.F.R. § 316.10. These regulations are entitled to deference, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (noting that "if Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to

-10-

the agency to elucidate a specific provision of the statute by regulation"), and have been upheld as a reasonable interpretation of the statutory requirement of good moral character and not ultra vires to the governing statute. See Dang, 488 F.3d at 1140-41; see also Jean-Baptiste, 395 F.3d at 1194 (collecting cases).

8 C.F.R. § 316.10 provides that an applicant "shall be found to lack good moral character" if, for example, he committed and was convicted of one of more crimes involving moral turpitude, other than a purely political offense, or if he committed and was convicted of two or more offenses where the aggregate sentence actually imposed was five years or more. 8 C.F.R. §§ 316.10(b)(2)(i) and 316.10(b)(2)(ii). Pertinently here, the regulations also contain a broader, catch-all provision:

> Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant:
>
> . . .
>
> Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b) (1) or (2).

8 C.F.R. § 316.10(b)(3)(iii). If an applicant falls within one of the statutory categories that requires that an applicant "shall be found to lack good moral character," he is precluded from establishing his good moral character and is accordingly ineligible for naturalization.

2.      Analysis

In this case, the statutory period ran from February 9, 1990 through August 5, 1996. The Government contends that Salama is precluded from establishing good moral character because, under 8 C.F.R. § 316.10(b)(3)(iii), he committed the act of insurance fraud in February 1995, an unlawful act that adversely reflected on his moral character.

Salama does not challenge whether the act negatively reflects on his moral character, but instead argues that the Government has failed to meet the evidentiary burden of showing that Salama committed the criminal act. He also claims that a genuine issue of material fact exists regarding whether Salama has shown or can show that extenuating circumstances exist.[3]   (Opp'n to MSJ at 8-10.)

The Court agrees with the Government, and concludes that Salama's criminal act in 1995 bars him from establishing his good moral character for the requisite statutory period.

> a.   Was the Criminal Act was Committed During the Relevant Period?

Under 8 C.F.R. § 316.10(b)(3)(iii), committing or being convicted during the statutory period of an unlawful act which adversely reflects on an applicant's moral character requires a finding that the applicant lacks good moral character unless the applicant can present extenuating circumstances. See United States v. Suarez, 664 F.3d 655, 661 (7th Cir. 2011) ("[A] conviction during the statutory period is not necessary for a finding that an applicant lacks good moral character. It is enough that the offense was "committed" during that time.").

It is undisputed that Salama plead guilty to an offense committed in February 1995, during the statutory period. (UMF No. 40.) Nevertheless,   Salama argues that the Government has not met its burden in showing when the act was committed. Salama's

---

[3] It should be noted that Salama does not attempt to challenge whether the crime in question, felony insurance fraud, had a negative impact on his moral character. See, e.g., Khamooshpour v. Holder, 781 F. Supp. 2d 888, 896 (D. Ariz. 2011) (Reasoning that an unlawful act under  8 C.F.R. § 316.10(b)(3)(iii) does not necessarily have to be a crime involving moral turpitude in order to reflect adversely on an applicant's moral character, or that all felonies or felony convictions would necessarily reflect adversely on a person's moral character. Rather, the circumstances of each crime or conviction must be considered on a case-by-case basis.)

challenge in this respect lacks merit.

Salama contends that the arrest report and plea agreement form (MSJ, Exs. 10, 12.) do not state when the criminal act was committed. Defendant is correct. Defendant further asserts that inclusion of the amended criminal complaint along with the minute orders fails to establish when the crime was committed and he claims that some of the documents are inadmissible hearsay. (MSJ, Exs. 11, 13; Opp'n to MSJ at 10.) What Defendant fails to acknowledge is that the exhibits, when viewed collectively, show that the crime was committed during the statutory period.

Salama's amended criminal complaint includes four counts of insurance fraud, all occurring between August 1993 and February 1995 --- during the relevant statutory period. (MSJ, Ex. 11.) Furthermore, Salama's plea form expressly indicates that Salama pled guilty to count one of the amended criminal complaint, insurance fraud committed in February 1995. (MSJ, Ex. 11.) A reasonable reading of the exhibits shows that Salama committed insurance fraud in February 1995. Even if there was doubt as to which count of insurance fraud Salama pled guilty to, all of the remaining three counts of insurance fraud also fall within the statutory period.

Salama also challenges the Government's success in meeting its evidentiary burden by clamming that some of the documents relating to the crime and subsequent conviction are hearsay and inadmissible. (Opp'n at 10.) Salama's plea, which establishes his lack of good moral character, is admissible under the Federal Rules of Evidence 803(22), which allows hearsay evidence of a "final judgment, entered after a trial or upon a plea of guilty . . . " or other exceptions to the hearsay rule. See Rosen v. Neilson (In re Slatkin), 310 B.R. 740, 744-46 (C.D. Cal. 2004); In re Homestore.com, Inc. Sec. Litig., 2011 U.S. Dist. LEXIS

10677 (C.D. Cal. Jan. 25, 2011).

Notwithstanding the Government's extremely high burden of establishing that Salama lacked good moral character, Salama's challenges do not undermine the Government's case. Salama does not dispute that he committed the criminal act or that he plead guilty after the statutory period. He only asserts that the Government has not shown that he committed the criminal act at the time during the statutory period when the government alleged he did. Salama provides no reasonable, or even plausible, factual alternative suggesting that the act may have been committed outside the relevant statutory period. The Government has made a sufficient showing. There is no genuine issue of material fact that the crime was committed during the relevant statutory period.

### b.    Did Extenuating Circumstances Exist?

Section 316.10(b)(3) begins with a possible exception to the general rule that an applicant "shall be found to lack good moral character" if the applicant committed certain criminal acts during the statutory period. 8 C.F.R. § 316.10(b)(3). Salama contends that, under that provision, he may avoid a finding that he lacks good moral character if he "establishes extenuating circumstances." Id. Salama argues that there remains a genuine issue of material fact regarding whether he has shown or can show extenuating circumstances that should have precluded summary judgment. (Opp'n at 9.) However, Salama provides no factual basis upon which such extenuating circumstances could be found to exist; instead he argues only that it is possible that extenuating circumstances exist.

Extenuating circumstances in the context of a determination of good moral character "must pertain to the reasons showing lack of good character, including acts negating good

character, not to the consequences of these matters." <u>Jean-Baptiste</u>, 395 F.3d at 1195 (collecting cases); <u>Suarez</u>, 664 F.3d at 662. Extenuating circumstances are those which render a crime less reprehensible than it otherwise would be, or "tend to palliate or lessen its guilt." <u>Suarez</u>, 664 F.3d at 662 (citing <u>Black's Law Dictionary</u>, Sixth Edition (1990)).

Other courts have granted summary judgment in favor of the Government in the face of arguments about possible extenuating circumstances. <u>See</u> <u>Suarez</u>, 664 F.3d at 662 (finding that defendant failed to raise a genuine issue of material fact despite presenting extenuating circumstances including that it was his first and only criminal conviction, he played a minimal role in the offense, and he received no compensation.); <u>Jean-Baptiste</u>, 395 F.3d at 1195 (finding that extenuating circumstances relating to the hardship of prison conditions in foreign jail and impact on his family do not relate to the criminal offense at issue and fail to show extenuating circumstances.) The Court need not make such a determination here. In this case, Salama has presented no facts in support of a claim of extenuating circumstances. He only argues that he may be able to show extenuating circumstances exist. (Opp'n at 9.)

At summary judgment, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." Arango, 670 F.3d at 994 (Also noting that "[a] defendant's sworn statements cannot be disbelieved at the summary judgment stage simply because his statements are in his interest and in conflict with other evidence."). Salama does note in his affidavit the basis for the insurance fraud conviction. (Salama Decl. ¶ 33.) He states:

> I was rear ended in a car accident and took my car in to have it repaired. The shop which my car was taken too was under investigation for insurance fraud and they over estimated the amount of my repairs. Thus I became involved in the insurance fraud claim. I hired attorney Jim Elia who

> plea bargained my case to probation only and the case was thus resolved.
> I served my time and paid my penalties.

(Id.) Salama's statement attempts to minimize his culpability and shift any wrongdoing to the automotive shop. It is difficult to understand how such statements serve to demonstrate extenuating circumstances. If Salama was an innocent customer of the automotive shop, he likely would not have been charged and, much more likely, he would not have plead guilty of the crime. Further, the fact that others were committing criminal acts and convinced him to join the criminal pursuit, does little, if anything, to minimize his own wrongdoing. Finally, Salama's assertion on his declaration that he was only required to serve a term of probation contradicts the undisputed material facts provided to the court. There, Salama conceded that he was sentenced to 90 days of incarceration in addition to probation and restitution. (Compare Salama Decl. ¶ 33 and UMF 41.) The assertions raised by Salama do not render his crime less reprehensible than it otherwise would be or tend to palliate or lessen his guilt. See Suarez, 664 F.3d at 662. Salama's statements create no genuine issue of material fact regarding potential extenuating circumstances.

Based on the above, Salama was not eligible for naturalization when, during the five years prior to his application, he committed a crime establishing a lack of good moral character. This is true regardless of whether or not he was convicted for the crime before his naturalization was complete. The Government is entitled to summary judgment on this claim.

**C.    Ground Two - Lack of Good Character Based on False Testimony**

The Government contends that Salama lacks good moral character by providing false testimony regarding his criminal activity during the immigration process. Under 8 U.S.C. § 1101(f)(6), giving false testimony for the purpose of obtaining an immigration

benefit precludes a finding of good moral character. <u>Kungys v. United States</u>, 485 U.S. 759, 779 (1988). In <u>Kungys</u>, the Supreme Court held that the bar applies to any misrepresentation "made with the subjective intent of obtaining immigration benefits," whether or not the misrepresentation is material to the immigration decision. <u>Id.</u> at 780.

It has been noted that false testimony does not include written statements made under oath. <u>Kungys</u>, 485 U.S. at 780-81, <u>Bernal v. United States</u>, 154 F.3d 1020, 1022-23 (9th Cir. 1998); <u>United States v. Nunez-Garcia</u>, 262 F. Supp. 2d 1073, 1083 (C.D. Cal. 2003). Thus, this Court finds that the statements in the application and on the oath form do not, in and of themselves, constitute false testimony under 8 U.S.C. § 1101(f)(6).

The Government contends that Defendant made false representations during the second naturalization interview. Defendant disputes making those statements. Specifically, he alleges that at the second interview, the INS officer did not ask him any questions regarding whether he had been arrested. (Opp'n at 4-5, Salama Decl. ¶¶ 25-29.) He also asserts that to the extent he was asked any questions, Defendant's attorney responded to those questions. (UMF Nos. 24-26.) There is a question of fact as to what Defendant stated at the interviews. Thus, summary judgment is not appropriate on a false testimony theory.

**D.    Ground Three - Concealment or Willful Misrepresentations During the Application Process**

Next, the Government contends that Salama's citizenship should be revoked based on his concealment or willful misrepresentation of criminal acts during the naturalization process. The denaturalization statute, 8 U.S.C. § 1451(a), permits the government to revoke citizenship if naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." <u>Arango</u>, 670 F.3d at 992-993.

-17-

The Court must determine whether Salama failed to disclose facts regarding his criminal history in order to obtain his United States Citizenship. The Government claims Salama concealed or misrepresented his criminal history on three separate occasions: in his naturalization application, at his second naturalization interview, and on his oath ceremony form.

As discussed above, there is a question of fact with regard to what was stated during the naturalization interview. Accordingly, the Court shall focus on alleged misrepresentations made on his naturalization application and in the oath ceremony notice.

At the outset, it is noted that Salama claims he never made any false representations in connection with his immigration status. First, he asserts that he "was never arrested, but given a citation to come to court" and so had no reason to state otherwise. (Salama Decl. ¶ 28.) He also claims the Government has failed to show he had knowledge that his purported unlawful conduct in February 1995 constituted insurance fraud. Salama also asserts that during the application process he informed his immigration attorney that he was "under investigation" by the Fresno Police Department for insurance fraud, but that he had not been arrested at that time. (Salama Decl. ¶ 22.) Finally, he claims further that his attorney prepared the naturalization application and insisted that Salama sign it without reading the documents.[4]

Rather than address all potential factual issues raised, the Court shall examine what appears to be the most striking of the concealments or misrepresentations. Regardless of other actions taken during the application process, the fact remains that Salama himself signed his oath ceremony form, certifying that "each of the answers shown above were

---

[4] While Salama provides specific facts for each instance where documents were signed or representations were made, they all are based on the same arguments presented above.

made by me or at my direction, and that they are true and correct." (UMF No. 31, MSJ Ex. 8.) Question three of the form states:

> AFTER the date you were first interviewed on your Application for Naturalization, Form N-400: (3.) Have you knowingly committed any crime or offense, for which you have not been arrested; or have you been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any lay or ordinance, including traffic violations?

(Id.) In viewing the question, Salama would have to answer "yes" to the question if he was "arrested, cited, charged, indicted, convicted, fined, or imprisoned." The Government has established that Salama appeared in court in February 1996, was charged with felony perjury, was ordered remanded into custody, and arrested. (UMF Nos. 34-35.) The Government has also provided a copy of an arrest report from February, 1996 that charges Salama with three counts of felony perjury (Cal. Penal Code § 118) and four counts of felony insurance fraud (Cal. Penal Code § 550(a)(1)) and notes that Salama was remanded into custody. (MSJ Ex. 11.) Salama does not genuinely dispute the history, he just characterizes it differently. He claims he was not arrested, but instead given a citation to come to court. (Salama Decl. ¶ 28.) As noted above, question three required Salama to check the 'yes' box if he was cited, but not arrested. He did not check the "yes" box. There is no genuine issue of material fact regarding whether Petitioner misrepresented on his oath ceremony form that he had not been arrested, or at least cited, after being interviewed.

Even if the statement on the oath ceremony form was a factual misrepresentation, Salama contends that it was not willfully made. Salama claims that his attorney filled out the form and instructed him to sign it without reading it, therefore negating any willful intent on his behalf. (UMF Nos. 30-31, Salama Decl. ¶ 29.)

With regard to willfulness, the Supreme Court has stated that this ground for denaturalization "plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." Kungys, 485 U.S. at 767. The Ninth Circuit has held that an alien who seeks to obtain immigration status by misrepresenting a material fact has done so "willfully" if the misrepresentation was "deliberate and voluntary," even if the INS has not shown that an alien intended to deceive the government. Arango, 670 F.3d at 994-995 (citing Espinoza-Espinoza v. INS, 554 F.2d 921, 925 (9th Cir. 1977)).

The term 'willful' in the relevant immigration statute has not been well developed. However, when the Supreme Court discussed the materiality requirement of 8 U.S.C. § 1451(a), it relied heavily on the materiality requirements set forth in federal fraud statutes, specifically 18 U. S. C. § 1001. See Kungys, 485 U.S. at 767. Moreover, the Supreme Court noted that the term material had been decribed and defined as early as the seventeenth century. Id. ("The term 'material' in § 1451(a) is not a hapax legomenon. Its use in the context of false statements to public officials goes back as far as Lord Coke. . . ."). Based on the common-law antecedents, the Supreme Court found it "unsurprising that a number of federal statutes criminalizing false statements to public officials use the term 'material.'" Id. In reviewing federal criminal statutes, the Supreme Court has found that the "federal courts have long displayed a quite uniform understanding of the 'materiality' concept." Id. Further, the Supreme Court found no reason that the materiality standard set forth in criminal law should differ in the immigration context. Id. at 770 ("While we have

-20-

before us here a statute revoking citizenship rather than imposing criminal fine or imprisonment, neither the evident objective sought to be achieved by the materiality requirement, nor the gravity of the consequences that follow from its being met, is so different as to justify adoption of a different standard.").

This Court believes, based on the same rationale, the requisite standard for "willful intent" as it is used in the criminal context should be adopted here in the same way that the criminal "materiality" concept has been adopted. "A conviction under [18 U. S. C. § 1001][5] requires proof that a defendant had the specific intent to make a false or fraudulent statement deliberately or at least with reckless disregard of the truth and with the purpose to avoid learning the truth. United States v. Puente, 982 F.2d 156, 159 (5th Cir. 1993) (quotations and citation omitted). The court explained the reason for allowing a finding of reckless indifference to be sufficient to show that a defendant intentionally made fraudulent statements:

> "Reckless indifference" has been held sufficient to satisfy § 1001's scienter requirement so that a defendant who deliberately avoids learning the truth cannot circumvent criminal sanctions. See United States v. Schaffer, 600 F.2d 1120, 1122 (5th Cir. 1979). Likewise, a defendant who deliberately avoids reading the form he is signing cannot avoid criminal sanctions for any false statements contained therein. Any other holding would write § 1001 completely out of existence.

Puente, 982 F.2d at 159. In Puente, the defendant claimed that he never read the Housing and Urban Development form, and the prosecution introduced no evidence that he knew what he was signing. Regardless, the district court concluded that, by signing the form without reading it, the defendant acted with "a reckless disregard of the truth and with the

---

[5] 18 U. S. C. § 1001 is the criminal statute for making fraudulent statements to a government officer, and the same statute that which the Supreme Court referred to in Kungys, with regard to the materialty standard. 485 U.S. at 767.

purpose to avoid learning the truth." Id.

Furthermore, the Supreme Court and Ninth Circuit have acknowledged the existence of the willful blindness doctrine which enables a finding of willful conduct when a defendant chooses not to inform himself of the truth. In finding the willful blindness doctrine should apply in civil actions for patent infringement, the Supreme Court described the application of the doctrine in the criminal context:

> The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. Edwards, The Criminal Degrees of Knowledge, 17 Mod. L. Rev. 294, 302 (1954) (hereinafter Edwards) (observing on the basis of English authorities that "up to the present day, no real doubt has been cast on the proposition that [willful blindness] is as culpable as actual knowledge"). It is also said that persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts. See United States v. Jewell, 532 F.2d 697, 700 (9th Cir.1976) (en banc).

Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2068-2069 (2011).[6]

In discussing the willful blindness, the Supreme Court referenced the seminal Ninth Circuit on point, United States v. Jewell.[7] 532 F.2d 697, 700 (9th Cir.1976). In an *en banc* decision reaffirming the holding of Jewell, the Ninth Circuit explained

> [The holding in Jewell] was a rather straightforward matter of statutory

---

[6] In dissent, Justice Kennedy, questioned unanimity of the application of the willful blindness doctrine in light of the majority's statement that it was well established at criminal law. Global-Tech Appliances, Inc., 131 S. Ct. at 2073 (Kennedy, Dissenting.) ("The Court appears to endorse the willful blindness doctrine here for all federal criminal cases involving knowledge. It does so in a civil case where it has received no briefing or argument from the criminal defense bar, which might have provided important counsel on this difficult issue.").

[7] A jury instruction for willful blindness is referred to a Jewell instruction. United States v. Heredia, 483 F.3d 913, 927-928 (9th Cir. 2007) (*en banc*).

interpretation: '[K]nowingly' in criminal statutes is not limited to positive knowledge, but includes the state of mind of one who does not possess positive knowledge only because he consciously avoided it. In other words, when Congress made it a crime to "knowingly . . . possess with intent to manufacture, distribute, or dispense, a controlled substance," 21 U.S.C. § 841(a)(1), it meant to punish not only those who know they possess a controlled substance, but also those who don't know because they don't want to know.

United States v. Heredia, 483 F.3d 913, 918 (9th Cir. 2007) (*en banc*). Accordingly, the willful blindness doctrine is well established at criminal law, and the Supreme Court has found it applicable in certain civil law contexts. Furthermore, based on the Supreme Court's past reliance on statutory interpretation of federal fraud statutes to define other terms in 8 U.S.C. § 1451(a) (see Kungys, 485 U.S. at 767), this Court finds that the willful blindness doctrine applies to the requite showing of willful intent.

While not directly discussing the scope of wilful conduct, other courts have already relied on reckless disregard or willful blindness to find the required willful intent under 8 U.S.C. § 1451(a). In United States v. Rebelo, the defendant argued that his false statement was excusable because it was made on the advice of his attorney and because he was never ultimately convicted of a crime involving moral turpitude, and that the Government has not established the willfulness and materiality prongs of the Kungys test. United States v. Rebelo, 646 F. Supp. 2d 682, 697 (D.N.J. 2009). The defendant attempted to rely on patent infringement cases that stood for the proposition that reliance on the advice of counsel is a factor that militates against a finding of willfulness. Id. The court found no corollary defense in the immigration context and found "as a matter of law that [defendant's] reliance on the advice of counsel is best described as an act of willful blindness rather than good faith." Rebelo, 646 F. Supp. 2d at 698.

In Singh v. Gantner, the district court found that reliance on the advice of counsel

did not negate a finding that misrepresentations on an immigration adjustment application were willful. 2008 U.S. Dist. LEXIS 59203, 9-10 (S.D.N.Y. July 30, 2008). In Singh, the applicant repeatedly misrepresented that he had not been arrested despite having been so several times. Id. The court found that even if the attorney had counseled him that he could deny those arrests on the applications, the misrepresentations were still intentional, especially in light that he signed the application under penalty of perjury. Id. The court reasoned:

> Moreover, as a matter of law, even if his attorney had advised him that he could deny the fact of his prior arrests, a finding of willfulness requires only that the misrepresentation be deliberate and voluntary. See Forbes, 48 F.3d at 442. Singh does not deny that his false statements were deliberate and voluntary, but merely protests that he thought he was permitted to misrepresent. And even this assertion rings hollow, particularly in light of Singh's certification "under the penalty of perjury under the laws of the United States of America, that [his] application and the evidence submitted with it is all true and correct.

Singh, 2008 U.S. Dist. LEXIS 59203, 9-10.

Turning to Defendant, his assertions fare no better than those described above. Defendant claims that he did not know if he was arrested during the insurance fraud investigation, but concedes that he was at least given a citation to come to court. (Salama Decl. ¶ 28.) He also states that he informed his attorney that he was under investigation for insurance fraud, that his attorney filled out his oath ceremony form, and told Defendant to sign it without reading it, which he did. (Id. ¶¶ 22, 29.)

Question three of the form specifically asked if Defendant had been arrested or cited after his first interview, and Defendant or his attorney answered "no". (MSJ Ex. 8.) Defendant then signed the form which specifically required Defendant to "certify that each of the answers shown above were made by me or at my direction, and that they were true

and correct." (Id.) Further the form stateed "Failure to provide all or any of the requested information may result in the denial of the application for naturalization." (Id.) The form was one page long, and contained seven relatively simple factual questions. For example, other questions on the form asked whether Defendant had since his first interview been married, widowed, separated or divorced, whether he had traveled out of the United States, and whether he had joined an organization, including the Communist Party. (Id.) Had Defendant read the simple and straightforward questions, he would have known that he was providing false answers. However, at best, he chose not to read the form.

Just as the court in Puente found that the criminal fraud statutes would be pointless if defendants could choose to deliberately not read a form to avoid a finding of intentional misrepresentation, this Court finds the logic equally compelling in the immigration context. 982 F.2d at 159. Here, Defendant acknowledges that he was at least in the process of being investigated for insurance fraud and had received a citation to appear in court. Had he reviewed the form, he would have known that he was making a misrepresentation by not answering "yes" to the question whether he had been arrested or cited. Even if his attorney had advised him he did not need to disclose the arrest, Defendant's reliance on such advice was not reasonable given the form's instruction to answer seven relatively straightforward questions truthfully.

While there may be times to reasonably rely on counsel's advice during a naturalization application, those times are not in issue here. Whether Defendant was arrested or cited is not a complex legal question. Defendant believed he was criminally cited, but failed to answer a question asking whether he had been cited reportedly because he did not read it. Petitioner's willful blindness serves as the requisite intent to

show that he willfully misrepresented his criminal activity during the application process and serves as a basis to revoke citizenship under the denaturalization statute, 8 U.S.C. § 1451(a). Arango, 670 F.3d at 992-993. As no genuine issues of a material fact exist, the Government is entitled to summary judgment.

## VI.    ORDER

For the foregoing reasons, the Court GRANTS Plaintiff's motion for summary judgment. The undisputed evidence establishes as a matter of law that Defendant procured his naturalization illegally based on his lack of good moral character and by concealment of a material fact and willful misrepresentation.


IT IS SO ORDERED.

Dated:    July 23, 2012          /s/ *Michael J. Seng*
                        UNITED STATES MAGISTRATE JUDGE